## Electric Welding Company *v.* Pittsburgh School District, Appellant.

Argued April 18, 1958. Before RHODES, P. J., HIRT, GUNTHER, WOODSIDE, ERVIN, and WATKINS, JJ. (WRIGHT, J., absent).

Before LENCHER, P. J., without a jury.

*Oscar G. Peterson,* Assistant Solicitor, with him *Mortimer B. Lesher,* Solicitor, for School District of Pittsburgh, appellant.

*James D. Wills,* with him *Miller, Hay & Entwisle,* for appellee.

OPINION BY WOODSIDE, J., June 11, 1958:

This is an appeal from a judgment of the County Court of Allegheny County sustaining an appeal of

the Electric Welding Company from a mercantile tax assessment made by the School District of Pittsburgh.

Both the decision and the statutory law which govern this case were reviewed by us in *Koolvent Aluminum Awning Co. of Pittsburgh v. Pittsburgh,* 186 Pa. Superior Ct. 233, and we see no reason to repeat here what we said there.

An examination of the findings of the court below convinces us that its conclusion was correct. In order to explain the operation of the Electric Welding Company we shall quote from the findings of President Judge LENCHER, and in doing so we shall substitute "company" for "appellant" to avoid the confusion which might arise from the fact that the appellant in the county court is the appellee here.

The court below found: "Electric Welding Company is a corporation under the laws of the Commonwealth of Pennsylvania, with its administrative office located in the Sherwyn Hotel Building, Pittsburgh, Pennsylvania, and its operating plant or shop situated in the Borough of Canonsburg, Washington County ..."

The company "is engaged in the business of engineering and the application of certain separate plant operations to steel materials from which are obtained concrete reinforcing steel products which are sold to corporations and individuals engaged in the construction of concrete highways, buildings and bridges. The company's products are (a) concrete reinforcing bars, (b) load transfer units, (c) column spirals, (d) special reinforcing assemblies, (e) wire mesh, which the company concedes is not a manufactured product.

"When an order is obtained from a customer, it is sent to the company's engineering department. An engineer, trained in concrete design, both through formal education in which an academic degree in engineering was conferred and through practical experience,

calls personally on the customer or the customer's engineer or architect and obtains from the general construction plans and specifications of the highway, building or bridge to be constructed the necessary detailed information as to sizes, shapes, forms and dimensions for the required products ordered by the customer. From this detailed information, shop drawings are made by a draftsman trained for this type of work. The shop drawings are then submitted to the customer for approval by the customer's engineer or architect. Following such approval, the shop drawings are sent to company's Canonsburg plant. The plant foreman selects from steel inventory the necessary materials and directs the plant workmen in the operations of shearing, bending, forming, fitting, welding and assembling of the materials in compliance with the directions and instructions of the shop drawings to obtain the finished product. The company is required, from time to time, to initially design a concrete steel reinforcing product for the particular need of a customer in those instances where a customer does not furnish a design. Company maintains an inventory of raw materials at its plant consisting of plain and deformed mill steel bars, steel rods, steel channels, steel plates, asphalt asbestos expansion boards and steel wire. Company purchases its steel materials from the Jones & Laughlin Steel Company and United States Steel Corporation.

(a) "Concrete reinforcing bars are designed products for a particular use in the construction of highways, buildings or bridges wherein concrete is a part of the structure. The purpose of concrete reinforcing bars is to strengthen the concrete at specific areas and points of the concrete structure. The reinforcing bars are arranged in place and secured as shown by the construction plans and then concrete is poured around

the bars. When the concrete hardens, the bars become part of the solidified mass thereby adding strength to the hardened concrete. When an order from a customer for concrete reinforcing bars is obtained, it is sent to company's engineering department. A trained engineer studies the general plans and specifications for the concrete structure and obtains all necessary details as to the design, size and dimensions of the concrete reinforcing bars required for the construction. Shop drawings are made by a draftsman from the detailed information obtained by company's engineer and these shop drawings are sent to the foreman at the plant. In accordance with the shop drawings, steel bars of the specified diameters, either plain or deformed, are selected from inventory which are then sent through the operations of shearing, bending and forming to obtain the finished product. Concrete reinforcing bars are specifically engineered, sheared, bent and formed for a particular concrete structure and are not usable for general purposes of reinforcing concrete. The company does not maintain a stock supply of finished concrete reinforcing bars. Reinforcing bars are sold to a customer only in accordance with the customer's design and specifications . . . The company maintains an inventory of raw materials for the reinforcing bars. The materials are mill steel bars, plain and deformed, measuring 60 feet in length and of various diameters.

(b) "Load transfer units are designed products for a particular use in the construction of concrete highways. Load transfer units are put into place transversely on the subgrade of the highway as shown on the general construction plans. The units provide a jointure for two continuous concrete slabs. The purpose of the load transfer units is to transfer the rolling load from one concrete slab to the other, to permit

expansion and contraction of the concrete slabs which is caused by the extremes of weather temperatures, and to prevent disalignment, cracking or splitting of the concrete [the engineering work and drafting is done by the company as outlined in paragraph (a) above]. In accordance with the shop drawings, steel bars of the specified diameters, steel plates and expansion boards are selected from inventory and sent through the operations of shearing the bars, shearing the expansion board, bending the bars, cutting, bending and punching the stake pocket, punching steel plates, assembling, and welding to obtain the finished product. The expansion boards are shipped to the job site and there attached to the units so as to prevent breakage of the board in transit. Load transfer units which are also called transverse dowel assemblies are specifically engineered for a particular highway construction. Their use is limited to the purpose for which designed and are not usable for any other concrete highway construction. The company does not maintain a stock supply of finished load transfer units. They are sold to a customer only in accordance with the customer's plans and specifications . . . The company maintains an inventory of raw materials for the load transfer units. The materials are steel bars, steel plates, asphalt expansion boards, and steel channels.

(c) "Column spirals are designed products for a particular use in concrete building and bridge pier construction. Column spirals are used to reinforce the concrete columns or bridge piers which support the structure. The spirals are set in place in accordance with the construction plans and then concrete is poured around the spiral. When the concrete hardens, the spiral becomes an integral part of the concrete mass of the column or pier . . . [the engineering work and drafting is done by the company as outlined in para-

graph (a) above]. In accordance with the shop draw-
ings, mill coils of steel rods and steel channels are se-
lected from inventory which are sent through the op-
erations of straightening the rods and recoiling to spec-
ified coil diameter and pitch, shearing the steel chan-
nels, punching the steel channels, welding and assem-
bling to obtain the finished product. Column spirals
are specifically engineered for a particular concrete
column or pier. The use of a spiral is limited to the
purpose for which designed and it is not usable for any
other concrete column or pier. The company does not
maintain a stock supply of finished column spirals.
They are sold to a customer only in accordance with
the customer's plans and specifications . . . The com-
pany maintains an inventory of raw materials for the
column spirals. The materials are mill coils of steel
rods, and steel channels.

(d) "There are instances where a problem of re-
inforcing concrete arises where the appellant is called
upon to originate a design that will perform a special
or isolated job of strengthening concrete. These spe-
cial assemblies are used in all types of concrete con-
struction. In some instances the special assemblies are
used as an integral part of the concrete by putting the
assembly in place and pouring concrete around it. In
other cases, the assembly will be a support for concrete
and not an integral part of the concrete. Trusses are
used in building construction to support a concrete
slab. Trusses are laid horizontally between two beams
of the building and concrete is poured over them. The
trusses at the base of the concrete provides added sup-
port to the concrete slab. Pile cages are used in bridge
construction. They are sunk vertically into the ground
at the point where the piers for the bridge will be lo-
cated. Concrete is poured into the ground around each
of the pile cages and when the concrete hardens, the

pile cage becomes an integral part of the concrete. The concrete piles then become support for the bridge pier which will rest on the piles. The engineer or architect of a customer of the company calls upon the company for its advice in designing an assembly to solve a special problem in reinforcing an area or point on any type of concrete construction. Company's engineer works with the customer's engineer or architect until a design is achieved and accepted by the customer's engineer or architect. Shop drawings containing all detailed information as to size, shape and dimensions of the special assembly are made from the special design. These shop drawings are then sent to the foreman at the plant. In accordance with the shop drawings, steel materials are selected from inventory and are sent through operations of shearing, bending, forming, fitting, assembling and welding as may be required to obtain the finished product. Since these special assemblies are made only from special design for a particular problem of reinforcing concrete, appellant does not maintain an inventory of any special assemblies . . ."

After reviewing the decisions, and applying the law to the above facts, the court below concluded, "We think it is plain that Electric Welding Company is a manufacturer in the popular and therefore in the statutory sense. The mercantile taxes are imposed upon persons who buy and sell and not upon those who sell what they make. Electric Welding Company being a manufacturer of concrete reinforcing bars, transverse dowel assemblies, column spirals and special reinforcing assemblies, is not subject to mercantile license taxes in respect to these products. As now conceded by counsel, wire mesh is no longer included within this appeal. It is sustained as to the other products."

The county court's conclusion is correct. Along with the other cases cited in *Koolvent Aluminum Co. of Pittsburgh v. Pittsburgh,* supra, we note the following: *Commonwealth v. Keystone Bridge Co.,* 156 Pa. 500, 27 A. 1 (1893); *Commonwealth v. Pittsburgh Bridge Co.,* 156 Pa. 507, 27 A. 4 (1893), and *Commonwealth v. McCrady-Rodgers Co.,* 316 Pa. 155, 160, 174 A. 395 (1934) in which it was said, "the mixture [cement] is just as much the product of manufacturing as are the steel beams delivered for erection in place."

The appellant contends that the company is not a manufacturer but a dealer in steel because what it buys is steel, and what it sells is steel. That is like saying that the maker of furniture is not a manufacturer of tables because what he purchases is lumber and what he sells is lumber.

The appellant also contends that the appellee's products are not manufactured because they are sold by the foot or by the pound. The method used to determine the price of a product is not the test of whether or not it is manufactured. Ready-mixed concrete, held in *Commonwealth v. McCrady-Rodgers Co.,* supra, to be manufactured, is usually sold at a price measured by the cubic yard.

There is no doubt in our minds that the load transfer units, column spirals and special reinforcing assemblies ("b", "c" and "d" above) are "manufactured" by the appellee. Although the question presented by the making of concrete reinforcing bars ("a" above) presents a more difficult problem, we are unanimously of the opinion that they, too, are "manufactured" by the appellee.

Judgment affirmed.